WILLIAM THOMAS GREENHAWK *v.* EMMA G. QUIMBY, ET AL.

[No. 3, January Term, 1936.]

*Decided April 9th, 1936.*

The case was argued before BOND, C. J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, and JOHNSON, JJ.

*Washington Bowie, Jr.,* with whom were *James A. Wise, Robert Moss, John C. North, Hugh M. Frampton,* and *Charles J. Butler,* on the brief, for the appellants.

*T. Hughlett Henry,* with whom were *Edward T. Miller, Ridgely P. Melvin,* and *T. Hughlett Henry, Jr.,* on the brief, for the appellees.

MITCHELL, J., delivered the opinion of the court.

On the 8th day of February, in the year 1932, Reuben N. Greenhawk, of Talbot County, Maryland, executed a purporting will, whereby, after directing the payment of all his debts and funeral expenses and directing his executor to provide a fund for the perpetual care of a family burial lot, he gave and devised all of his property to Emma G. Quimby. The testator died on March 3rd, 1932, and his will was produced before the Orphans' Court of Talbot County two days later by its custodian and executor, Edward T. Miller.

The three subscribing witnesses proved the execution of the will, which was not admitted to probate because notice had been given that a caveat would be filed. A week later the petition and caveat was filed by the three brothers of the testator, William Thomas Greenhawk, John W. Greenhawk, and Charles H. Greenhawk, who were his nearest next of kin and heirs at law. The caveat was based upon the usual allegations that the will was not duly executed, that the testator was mentally incompetent, and did not know or understand the contents of the will, and that it was procured by undue influence. An answer was filed by the beneficiary and the executor, and finally six issues were framed by the Orphans' Court and the record transmitted to the Circuit Court for Talbot County, where the case was tried before the court, sitting as a jury, and resulted in a verdict and judgment for the caveators. Upon appeal from certain rulings of the lower court, this court reversed that judgment, and awarded a new trial. *Quimby v. Greenhawk,* 166 Md. 335, 171 A. 59. A second appeal in the case, involving a procedural matter arising in the Orphans' Court of Talbot County, was later heard by this court, and the rulings in the latter case are reported in *Greenhawk v. Quimby,* 168 Md. 396, 177 A. 537.

After the termination of the first appeal, a suggestion of removal was made, and the case thereupon sent to the Circuit Court for Anne Arundel County for trial. In the latter court the case was tried before a jury, the verdict

being for the caveatees; and from the rulings of that court this appeal is taken.

The record brings before us for review a single bill of exceptions based upon the rulings of the lower court in rejecting the sixth, ninth, and tenth prayers of the caveators, and in granting the first, second, third, sixth, seventh, eighth, and ninth prayers of the caveatees.

The issues submitted to the jury in the trial court may be divided into four classes, as follows: (a) Nos. 1 and 4 relate to the mental capacity of the testator at the time of the execution of the will. (b) Nos. 2 and 3 relate to the *factum* of the will. (c) No. 5 relates to the procurement of the will by undue influence. (d) And No. 6 relates to its procurement by fraud, or duress, exercised and practiced upon the testator.

The three rejected prayers of the caveators embraced in the exception are directed solely to the *factum* of the will. And of the granted prayers of the caveatees, to which exceptions were taken, the first and eighth prayers are directed to the *factum* of the will; the second to its procurement by undue influence; the third to its procurement by fraud; the sixth and seventh being instructions that the presumption of law is in favor of the sanity of the testator and his capacity to make a valid will, and the ninth an instruction as to his mental capacity.

At the hearing in this court on this appeal, all questions raised by the exceptions were abandoned by the appellants, except, however, the rulings of the lower court upon the respective prayers directed to the execution or *factum* of the will. It therefore follows that the only question now before us is: Whether the will of the testator was executed in such manner and under such formalities as are required by the laws of this state?

At the time of the execution of the will, Mr. Greenhawk was seventy-five years of age. He was afflicted with a cancer of the rectum and had suffered from that dread malady for some months. Either by his direction, or otherwise, it not being apparent in the record, a telephone message was sent by his attending physician, Dr. James

B. Merrett, to the office of Mr. Edward T. Miller, to the effect that the testator desired to see Mr. Miller, an attorney, for the purpose of having his will prepared. The attorney thereupon visited the home of Mr. Greenhawk, accompanied by his secretary, Meta T. Wallace. After conferring with his client and receiving directions for the purposes of preparing the will, the attorney then called his secretary into the sick man's room and dictated to her, in the presence of the testator, the will now in controversy. The same was written in longhand and read to Mr. Greenhawk by Mr. Miller. Subsequently, Mr. Miller called into the room Mrs. Emma G. Quimby, the principal beneficiary of the testator's estate, and again read the will. At both readings the testator was asked by his attorney if the document was drawn as he wished, and it was approved, as drawn, by the decedent. Mrs. Quimby was then asked by Mr. Miller whether any persons were immediately accessible who would be available as witnesses to the will, and upon being told that her daughter, and Louis Dawkins and Mary Blessing, were in the house, the attorney suggested that she call the two latter persons into the testator's room.

Upon their entrance to the room, the attorney testifies as follows: "I don't remember anything particular except when the witnesses came in, I explained the usual routine, a will to be legal had to have two people who had to be requested to do so by the testator, and I asked them if they would serve, and I asked Mr. Greenhawk if he wanted to request these two people to act as witnesses, and he either nodded his head or said 'Yes.' I don't remember exactly what he did, but he indicated very clearly that was right."

The testator at this time was in bed, and upon being handed the will, arose from his position and sat on the side of his bed. In this latter position, and in the presence of the two witnesses, the attorney, Mrs. Quimby, and Mrs. Wallace, he proceeded to sign the will. He was nervous, and it took him several minutes to write the initials of his Christian names—"R." "N." Upon noting the

disability under which Mr. Greenhawk was then labor-
ing, the attorney said to him, "Mr. Greenhawk, would you
like Mrs. Wallace to sign your name for you?" Testifying
further, he states: "And he asked me would it be legal,
could that be done, and I said, be perfectly all right, and
he turned to Mrs. Wallace, handed her the will and the
pen and got back in bed, and she came to the side of the
bed and I said I suggest you write around those initials.
Reuben N. Greenhawk, and put 'his' above the x and
'mark' below, and she did, and following that the will was
witnessed by three witnesses. They were all right there
at his bed."

The third witness to the will was Mrs. Wallace, who
had written it, and it is apparent that all three of the
witnesses signed the document in the presence of the
testator and in the presence of each other; and that at
least two of them signed it at his express request.

The photostatic copy of the will exhibited at the hear-
ing in this court does not reveal that an x mark was
placed upon it by any one, and it is evident that the testi-
mony of Mr. Miller with reference to an x mark, above
quoted, referred to the initials which the testator had
placed upon the document in his attempt to sign his name.
These initials were treated, for the purposes of the exe-
cution of the will, as representing the x mark of the tes-
tator, and we see no reason why they could not be so
construed, as the words "his" and "mark," appear, re-
spectively, above and below the initials.

Section 332 of article 93 of the Code provides as fol-
lows: "All devises and bequests of any lands, or tene-
ments, or interest therein, and all bequests of any goods,
chattels or personal property of any kind, as described in
section 328, shall be in writing and signed by the party
so devising or bequeathing the same, or by some other
person for him, in his presence and by his express direc-
tion, and shall be attested and subscribed in the presence
of the said devisor by two or more credible witnesses, or
else they shall be utterly void and of none effect." And
it is contended by the appellants that the will in contro-

versy was not executed in accordance with the provisions of that section.

In 2 *Greenleaf on Evidence* (16th Ed.) sec. 674, it is said: "A signature consists both of the act of writing the party's name, and of the intention of thereby finally authenticating the instrument. It is not necessary that the testator should write his entire name. His mark is now held sufficient, even though he was able to write." Upon the theory that the will was actually signed by Mr. Greenhawk, we are of the opinion that he fully complied with the formality of placing his mark thereto.

But the law of this state does not require that a testator write his name or affix his mark to the instrument. It is complied with if the name be signed "by some other person for him, in his presence and by his express direction," (section 332, article 93) and this was done by Mrs. Wallace, who affixed the full name of the testator to the document in the appropriate place for his signature. The uncontradicted evidence is that this was done with full knowledge on the part of Mr. Greenhawk, in his presence and with the intention that what was done be construed as being the execution of his will.

The will was prepared in accordance with the directions of the testator, it was dictated to the scrivener in his presence, read to him upon its completion, and reread to him after Mrs. Quimby entered his room. He was advised of the number of witnesses necessary for its legal execution, and, when confronted by them, and handed the document, and a pen for the purposes of his signature, he proceeded to sign it in their presence. He wrote in intelligible letters the first initials of his name, when, prompted by the weak physical condition of the testator, his attorney suggested that his signature be written by Mrs. Wallace, who was then sitting by his side. "Would it be legal, could that be done?" he queried, and upon being assured that it would be legal, he handed the document and pen to Mrs. Wallace.

While the record does not affirmatively show that he expressly directed her to affix his name by words to that

effect, it is clearly apparent that such was his intention, when he passed the document and pen to her, and the inference that "actions speak louder than words" may be appropriately applied to the facts in this case.

Turning now to the second point stressed by the appellants, whereby it is urged that the will was not signed by the testator, and attested and subscribed in his presence, by two or more credible witnesses, we cannot agree with that contention. Section 332 of article 93 does not in direct terms provide that a testator shall expressly request the witnesses to attest and subscribe to the will, and we are of the opinion that its provisions have been substantially complied with in this case.

In *Higgins v. Carlton,* 28 Md. 115, 141, it is said: "The testamentary law of this State does not require that a testator should ask them (the subscribing witnesses), to attest it (the will). His assent, either express or implied, is sufficient; provided 'the act be done with his knowledge, and not in a clandestine and fraudulent way.' " And in *Gross v. Burneston,* 91 Md. 383, 46 A. 993, in construing section 332, the late Chief Judge McSherry said: "That the testator must in some way request the subscribing witnesses to attest the will is obviously involved in this requirement. The validity of the will is made to depend upon the instrument being attested by two or more credible witnesses; and it cannot well be perceived how it could be attested at all, unless the testator directly or indirectly requested those persons who do attest it to subscribe their names to it as witnesses. The law throws around testamentary papers the utmost precautions to prevent fraud and imposition, and it would seriously weaken these safeguards if it were held that no request at all, or in any form, by the testator to the subscribing witnesses, were needed. But it is not meant by this that the testator should ask the witnesses to sign, because facts which are sufficient in law to constitute a legal request on his part are all that must be proved."

The testimony is conclusive in this case that the testator was asked the direct question if he wanted to request

two of the subscribing witnesses to act as such, and that in response to that question, he "either nodded his head or said yes." And while the record now before us does not reveal that a similar formality was followed with reference to the third attesting witness, we are of the opinion that the facts surrounding the attestation of the third witness were sufficient in law to constitute a legal request on the part of the testator. It might be added, however, that the attestation of a third witness was not necessary to the validity of the will. The document was formally proved by all three of the subscribing witnesses, in the Orphans' Court, and while, in the trial of the case before the lower court, one of the witnesses, who had been actually requested by the testator to attest and subscribe the will, was absent and did not, therefore, testify, her signature to the will was proved by other subscribing witnesses, and by other witnesses, who testified that they each saw the then absent witness sign the document in the presence of the decedent. Code, art. 93, sec. 363.

Finding no error in the rulings of the trial court, the rulings below will be affirmed.

*Rulings affirmed.*